T.C. Memo. 2014-258

UNITED STATES TAX COURT

PEYMON MOTTAHEDEH AND APRIL MOTTAHEDEH, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22039-11.                    Filed December 29, 2014.

Peymon Mottahedeh and April Mottahedeh, for themselves.

<u>Miles D. Friedman</u> and <u>Sebastian Voth</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, <u>Judge</u>:  The petitioners, Peymon Mottahedeh and April

Mottahedeh, a married couple, did not file federal-income-tax returns for the years

2001 through 2006.  The respondent (the "IRS") mailed a separate notice of

[*2] deficiency to each spouse for these years.[1]  The notices of deficiency reflected the following deficiency determinations and additions to tax:[2]

| Year | Petitioner | Deficiency | Additions to tax | | |
| --- | --- | --- | --- | --- | --- |
| | | | Sec. 6651(a)(1) | Sec. 6651(a)(2) | Sec. 6654 |
| 2001 | Peymon Mottahedeh | $8,203 | $1,846 | $2,051 | $328 |
| | April Mottahedeh | 4,634 | 1,043 | 1,159 | 185 |
| 2002 | Peymon Mottahedeh | 11,316 | 2,546 | 2,829 | 378 |
| | April Mottahedeh | 3,331 | 749 | 833 | 111 |
| 2003 | Peymon Mottahedeh | 12,811 | 2,882 | 3,203 | 331 |
| | April Mottahedeh | 3,704 | 833 | 926 | -0- |
| 2004 | Peymon Mottahedeh | 12,215 | 2,748 | 3,054 | 350 |
| | April Mottahedeh | 3,471 | 781 | 868 | -0- |
| 2005 | Peymon Mottahedeh | 10,102 | 2,273 | 2,526 | 405 |
| | April Mottahedeh | 2,669 | 601 | 668 | 107 |
| 2006 | Peymon Mottahedeh | 15,560 | 3,501 | 3,890 | 736 |
| | April Mottahedeh | 4,901 | 1,103 | 1,225 | 232 |

After concessions by the parties,[3] the following issues remain to be decided:

---

[1]The notice to April Mottahedeh was issued to "April L. Beatty", her former name.

[2]All dollar amounts are rounded to the nearest dollar.  Unless otherwise noted, all references to sections are to the Internal Revenue Code in effect for the years at issue, 2001 through 2006 and all Rule References are to the Tax Court Rules of Practice and Procedure.

[3]The Mottahedehs conceded that April Mottahedeh received wage income
(continued...)

**[\*3]** (1) Whether the IRS correctly determined that the Mottahedehs earned the

following amounts of income in the aggregate:[4]

| Year | Amount |
|------|--------|
| 2001 | $44,757 |
| 2002 | 61,536 |
| 2003 | 69,653 |
| 2004 | 66,924 |
| 2005 | 56,850 |
| 2006 | 83,629 |

We hold that the determinations are correct.  See infra part 1.

---

[3](...continued)
of $11,469 during 2001.  The IRS conceded that the Mottahedehs are not liable for additions to tax under sec. 6654 for the tax year 2001.

[4]For 2001, the IRS determined that the Mottahedehs' spending for the year was $44,757, the number appearing in the table for 2001.  The IRS also determined that the Mottahedehs were required to include this amount in income for 2001.  In addition to this amount, the IRS determined that April Mottahedeh earned $11,469 in wages for 2001.  The Mottahedehs concede that she earned this amount of wages.  The Mottahedehs challenge the IRS's determination that they earned $44,757 in income for 2001 on various grounds, but they do not argue that the IRS erred by combining the $44,757 amount it determined the Mottahedehs earned on the basis of their spending and the $11,469 that April Mottahedeh earned in wages, for a total income amount of $56,225.  Therefore, it is appropriate to define the disputed issue for 2001 as whether the IRS correctly determined that the Mottahedehs were required to include $44,757 in income.  For further explanation, see infra notes 12 and 14.

**[*4]** (2) Whether under California community-property law the income is Peymon Mottahedeh's sole property or community property. We hold that it is community property. See infra part 2.

(3)    Whether the Mottahedehs are liable for section-6651(a)(1) additions to tax for failing to file tax returns for the tax years 2001, 2002, 2003, 2004, 2005, and 2006. We hold that they are liable. See infra part 3.a.

(4)    Whether the Mottahedehs are liable for section-6651(a)(2) additions to tax for failing to pay tax for the tax years 2001, 2002, 2003, 2004, 2005, and 2006. We hold that they are liable. See infra part 3.b.

(5)    Whether Peymon Mottahedeh is liable for section-6654 additions to tax for failing to pay estimated income tax for the tax years 2002, 2003, 2004, 2005, 2006, and whether April Mottahedeh is liable for 2002, 2005, and 2006. We hold that they are liable. See infra part 3.c.

FINDINGS OF FACT

The stipulation of facts, as supplemented, is incorporated herein by this reference.

At the time they filed their petition, the Mottahedehs resided in California. Therefore, an appeal of our decision in this case would go to the U.S. Court of Appeals for the Ninth Circuit unless the parties stipulate venue in another circuit.

[*5] See sec. 7482(b)(1), (A), (2).  In resolving this case, we follow the precedent

of the Ninth Circuit.  See Golsen v. Commissioner, 54 T.C. 742, 756-758 (1970),

aff'd, 445 F.2d 985 (10th Cir. 1971).

The Mottahedehs were married during the years 2001 through 2006.

Peymon Mottahedeh operated a business called the "Freedom Law School".

April Mottahedeh was heavily involved in the business.  Since at least 1999, the

Freedom Law School has organized conferences attended by hundreds of people.

The Freedom Law School charged fees to the attendees.  The Freedom Law

School also sold books, tapes, CDs, and DVDs.  It also sold packages of services,

including:

- the "Simple Freedom Package" (for an initial fee of $4,000);

- the "Royal Freedom Package" (for an initial fee of $6,000).

The Freedom Law School also offered multilevel marketing arrangements,[5]

including:

- "Freedom Fighter in Training";

- "Freedom Promoter";

---

[5]In a multilevel marketing arrangement, a salesperson earns a commission on sales made by other salespersons who were recruited by the salesperson.  See Elliott v. Commissioner, 90 T.C. 960 (1988), aff'd without published opinion, 899 F.2d 18 (9th Cir. 1990), for a general discussion of multilevel marketing.

**[*6]** •    "Freedom Leader"; and

•    "Master Freedom Leader".

Through its conferences, materials, and service packages, the Freedom Law

School promoted various techniques for evading the payment of federal income

taxes.  The techniques included:

•    Minimize financial records.[6]

•    Do not give information to the IRS.[7]

•    Do not file tax returns.[8]

---

[6]According to the Freedom Law School:  "ALL records can and will be used against you."

[7]According to the Freedom Law School, a taxpayer receiving an IRS summons should give the IRS no information other than the taxpayer's name and address.  According to the Freedom Law School:

> If the aware citizen did not hang himself by confessing to earnings from employers or other third parties, the IRS agents would actually have to work and conduct a full investigation in order to find witnesses who could testify that he had actually worked or performed services for the third party payers.  Additionally, the IRS would have to bring to court the original of ALL the cancelled checks that would back up the IRS' claims against you.  Do you think this is easy for the IRS to do?

[8]According to the Freedom Law School:

> Why are filers so EASY to RAPE and ABUSE by the IRS?  Because these misinformed people, by VOLUNTARILY filling out a 1040

(continued...)

[*7] The Mottahedehs collected the fees paid by the Freedom Law School's customers. Peymon Mottahedeh also represented taxpayers before the California Franchise Tax Board for a fee.

The Mottahedehs applied the tax-evasion techniques advocated by the Freedom Law School to their own financial affairs (including the operation of the Freedom Law School and Peymon Mottahedeh's representation of taxpayers before the California Franchise Tax Board).  They encouraged their customers to pay them in cash.  They tried to avoid banks and other financial institutions.  They did not generally keep financial records.  They masked their ownership of two properties from the IRS through sham trust arrangements.[9]  They did not file federal-income-tax returns for the tax years 2001 through 2006.

In January 2008, the IRS began an audit of the Mottahedehs' federal-income-tax liabilities for the years 2001 through 2006.[10]  The IRS revenue agent

---

[8](...continued)
Income Tax Confession form had given the IRS the full laundry list of everything they own, so that the IRS knows WHERE to go to steal their victim's wealth and assets.

[9]The two properties are a house in Phelan, California, in which the Mottahedehs live and a property in Victorville, California.

[10]Before the audit for these years, the IRS had other interactions with Peymon Mottahedeh.  It had attempted to collect delinquent taxes for prior tax

(continued...)

[*8] assigned to the audit wrote a letter to the Mottahedehs inviting them to meet with her on March 21, 2008, at an IRS office in San Bernardino.[11] The Mottahedehs did not appear at the March 21, 2008 meeting.

On March 28, 2008, the revenue agent served each of the Mottahedehs with a summons requesting that they bring information about the so-called Simple Freedom Package and the so-called Royal Freedom Package (including the names of anyone who had bought these service packages) to her office in Long Beach, California, at 9 a.m., Monday, April 28, 2008. On Friday, April 25, 2008, Peymon Mottahedeh left voicemail messages with the revenue agent asking for her fax number so that he could fax her a letter about the summonses. A day later, on Saturday, April 26, 2008, he mailed a letter about the summonses to the revenue agent by express mail. In the letter the Mottahedehs stated that they would comply with the summonses only if the revenue agent answered 36 questions set forth in the letter. In the letter the Mottahedehs also stated that the Long Beach office was too far from their house in Phelan, at least 1-1/2 half hours away. They suggested

---

[10](...continued)
years. It had investigated him for promoting abusive tax shelters and for criminal tax violations.

[11]San Bernardino is between the IRS agent's office in Long Beach and the Mottahedehs' house in Phelan.

[*9] they meet instead in a "library meeting room" in either San Bernardino, Ontario, or Riverside.

The Mottahedehs did not appear at the meeting scheduled for 9 a.m., April 28, 2008. At 9:22 a.m. that day, the revenue agent sent an email to some other IRS employees stating that she had listened to Peymon Mottahedeh's April 25, 2008 voicemails in which he had requested her fax number in order to send her a letter about the summonses. In her email the revenue agent complained that she did not want to call Peymon Mottahedeh because he might be playing "another game". Nonetheless, the revenue agent called Peymon Mottahedeh on April 28. Unable to reach him, she left him a voicemail message with her telephone number. He did not return her call. Later on the same day, the revenue agent received the letter about the summonses that Peymon Mottahedeh had mailed on April 26, 2008.

On June 20, 2008, the revenue agent sent a written request to Peymon Mottahedeh for the records of his business activities for the years 2001 through 2006. She requested that he mail the records to her by July 7, 2008. Peymon Mottahedeh did not mail her the requested records.

Besides seeking information from the Mottahedehs, the revenue agent also sought information from various parties with whom the Mottahedehs did business. However, she was unable to get enough information to directly determine the

[*10] amounts of the Mottahedehs' income.  Consequently, she determined their income by assuming that their annual income was equal to their annual spending.  To estimate some categories of the Mottahedehs' spending, the agent relied on average spending statistics from the Bureau of Labor Statistics.  For other categories of spending (categories for which she had specific information), she estimated directly how much the Mottahedehs spent.  Using this combined approach, the agent made the following estimates of the couple's spending: $44,757 for 2001, $61,536 for 2002, $69,653 for 2003, $66,924 for 2004, $56,850 for 2005, and $83,629 for 2006.  For income-tax purposes, the revenue agent assumed that each spouse earned half of each of these annual spending estimates.[12]

---

[12]For 2001, however, there is a deviation that is best explained after explaining the other five years, 2002 through 2006.  For 2002, the revenue agent assumed that Peymon Mottahedeh had $30,768 in gross income and that April Mottahedeh also had $30,768.  For 2003, the revenue agent assumed that Peymon Mottahedeh had $34,826 in gross income and that April Mottahedeh also had $34,826.  For 2004, the revenue agent assumed that Peymon Mottahedeh had $33,462 in gross income and that April Mottahedeh also had $33,462.  For 2005, the revenue agent assumed that Peymon Mottahedeh had $28,425 in gross income and that April Mottahedeh also had $28,425.  For 2006, the revenue agent assumed that Peymon Mottahedeh had $41,814 in gross income and that April Mottahedeh also had $41,814.  Thus for each year from 2002 through 2006, the revenue agent assumed that each spouse earned half of the aggregate spending estimate.  For 2001, however, the revenue agent assumed that April Mottahedeh earned $11,469 in wages plus $22,378 (half of the aggregate spending estimate), a total gross income for her of $33,847.  The revenue agent assumed Peymon Mottahedeh earned $22,378 in gross income (half of the aggregate spending

(continued...)

[*11] For self-employment-tax purposes, the revenue agent assumed that Peymon Mottahedeh alone earned self-employment income equal to the amount the revenue agent estimated the couple spent for each year. Using the above-described determinations, estimates, and assumptions to calculate each spouse's tax liability, the IRS prepared a substitute for return for each spouse for each of the six years. The notice of deficiency sent to each spouse reflected the same tax calculations used in preparing the substitutes for returns.

OPINION

1. The IRS correctly determined that the Mottahedehs earned in the aggregate $44,757 for 2001, $61,536 for 2002, $69,653 for 2003, $66,924 for 2004, $56,850 for 2005, and $83,629 for 2006.

Section 1 imposes an income tax on annual taxable income. Taxable income is defined as gross income minus deductions. Sec. 63(a). Gross income includes income from any source, including compensation for services. Sec. 61(a)(1).

The income tax liability of a married couple who file a joint return is calculated by aggregating the spouses' income. Sec. 6013(d)(3). The resulting tax liability is jointly borne by the couple. Id. But for a married couple who, like the

_____

[12](...continued)
amount).

[*12] Mottahedehs, do not file a joint return, a separate income tax is imposed on each spouse's income.  Sec. 1(d); see also Ordlock v. Commissioner, 533 F.3d 1136, 1138 (9th Cir. 2008), aff'g 126 T.C. 47 (2006).  Thus, the income tax imposed on the income of each of the Mottahedehs is calculated by determining the income of each spouse.  As a preliminary step the IRS first determined amounts of income that the Mottahedehs earned in the aggregate.  We consider the correctness of this determination in this part 1 of the opinion.  See infra part 2 for the discussion of the question of how these amounts should be allocated to each spouse.

In the notices of deficiency, the IRS determined that the Mottahedehs earned the following amounts of income in the aggregate:  $44,757 for 2001, $61,536 for 2002, $69,653 for 2003, $66,924 for 2004, $56,850 for 2005, and $83,629 for 2006.

These amounts were unreported, as neither of the Mottahedehs filed income tax returns for the years 2001 through 2006.  In Weimerskirch v. Commissioner, 596 F.2d 358, 360-362 (9th Cir. 1979), rev'g 67 T.C. 672 (1977), the Court of Appeals for the Ninth Circuit held that for the IRS to prevail in a case involving unreported income, it must build a minimal evidentiary foundation that links the taxpayer to the alleged income-producing activities.  We find that sufficient

**[\*13]** evidence links Peymon Mottahedeh to the income-producing activities of (1) the Freedom Law School, and (2) practice before the California Franchise Tax Board. We first consider the Freedom Law School. The Mottahedehs stipulated that "Peymon Mottahedeh is the president and founder of Freedom Law School" and that "Peymon Mottahedeh was the president of Freedom Law School continuously during the years at issue." Furthermore, documentary evidence connects Peymon Mottahedeh to the Freedom Law School. For example, Peymon Mottahedeh's name was mentioned in customer testimonials on the Freedom Law School's website. His name and picture were prominently displayed in other promotional materials of the Freedom Law School. Documentary evidence also establishes that April Mottahedeh helped operate the Freedom Law School by arranging conferences and handling its finances. Her name appears on several checks and money orders received from customers of the Freedom Law School. Checks and money orders from the customers were deposited into her account at Arrowhead Credit Union. There are several hundred pages of these documents. April Mottahedeh's name appears on various legal documents that the Mottahedehs used to conceal their ownership of two properties. To better conceal their ownership, she also apparently wrote letters to lenders under a fake letterhead falsely claiming that she managed property as a trustee. As to Peymon

[*14] Mottahedeh's involvement in practice before the California Franchise Tax Board, the record contains copies of official announcements of the hearings involving the board in which he was listed as the representative of several taxpayers. One of his customers testified that during the years 2003 through 2009 he paid a total of $22,000 to Peymon Mottahedeh to represent him before the California Franchise Tax Board. The payments were made in cash at Peymon Mottahedeh's request. Additionally, April Mottahedeh participated in Peymon Mottahedeh's practice before the California Franchise Tax Board. She helped operate the Freedom Law School, and the record demonstrates that his practice before the California Franchise Tax Board was linked to the Freedom Law School. For example, the website for the Freedom Law School offered assistance to persons involved with disputes with the state taxing authorities such as the California Franchise Tax Board.

We conclude that the IRS has established the minimal evidentiary foundation required by Weimerskirch v. Commissioner, 596 F.2d at 360-362. The IRS has linked both Peymon Mottahedeh and April Mottahedeh to the income-producing activities of Freedom Law School and the practice before the California Franchise Tax Board. Technically, it is sufficient for the IRS to prove a link to Peymon Mottahedeh alone. See Costa v. Commissioner, T.C. Memo. 1990-572,

**[*15]** 60 T.C.M. (CCH) 1178, 1186-1187 (1990). This is because the income

from these activities is community property. See infra part 2.

Next we consider whether the IRS's determinations are supported by the

preponderance of the evidence.[13] The factual question to be resolved for 2001 is

---

[13]A taxpayer generally has the burden of proof regarding determinations in the notice of deficiency. Tax Ct. R. Pract. & Proc. 142(a); Rockwell v. Commissioner, 512 F.2d 882, 885 (9th Cir. 1975), aff'g T.C. Memo. 1972-133. The burden of proof is the burden of persuasion, which requires the taxpayer to "show the merits of * * * [the] claim by at least a preponderance of the evidence." Rockwell v. Commissioner, 512 F.2d at 885; see also Hardy v. Commissioner, 181 F.3d 1002, 1004 (9th Cir. 1999), aff'g T.C. Memo. 1997-97; Rapp v. Commissioner, 774 F.2d 932, 935 (9th Cir. 1985). Sec. 7491(a) provides an exception to the general rule that the taxpayer bears the burden of proof. Sec. 7491(a) imposes the burden of proof on the IRS for factual issues for which four conditions have been met: (1) the taxpayer complied with the substantiation requirements of the Internal Revenue Code, (2) the taxpayer maintained all records required under the Internal Revenue Code, (3) the taxpayer cooperated with reasonable requests by the IRS for witnesses, information, documents, meetings, and interviews, and (4) the taxpayer introduced credible evidence. Sec. 7491(b) provides another exception to the general rule that the taxpayer bears the burden of proof: "In the case of an individual taxpayer, the Secretary shall have the burden of proof in any court proceeding with respect to any item of income which was reconstructed by the Secretary solely through the use of statistical information on unrelated taxpayers." The term "Secretary" means "the Secretary of the Treasury or his delegate", sec. 7701(a)(11)(B), and the term "his delegate" means "any officer, employee, or agency of the Treasury Department duly authorized by the Secretary of the Treasury directly, or indirectly by one or more redelegations of authority, to perform the function mentioned or described in the context", sec. 7701(a)(12)(A)(i). The Mottahedehs contend that sec. 7491(a) and (b) imposes the burden of proof on the IRS. We resolve all factual issues in this case based on a preponderance of evidence. Therefore, we need not consider whether the IRS has the burden of proof. See Estate of Bongard v. Commissioner, 124 T.C. 95,

(continued...)

[*16] this:  Did the Mottahedehs earn $44,757 of income?[14]  For each of the

_____

[13](...continued)
111 (2005).

[14]Both parties assume that $44,757 is the relevant amount for 2001.  Thus, the IRS's opening brief contains this statement:  "RA Thai correctly determined that petitioners had $44,757.00 of income during 2001 based on respondent's BLS analysis, as modified by petitioners' actual expenses and records."  The Mottahedehs' response is that this statement and similar statements about other years "are all wrong since they all erroneously claim that THAI used BLS numbers to assess taxes against PETITIONERS."
        The Court observes that for 2001 the notice of deficiency determined that the Mottahedehs earned the following amounts of income:

| Taxpayer | Explanation | Amount |
| --- | --- | --- |
| April Mottahedeh | Wage income | $11,469 |
| April Mottahedeh | April Mottahedeh's one-half share of $44,757 (the IRS's estimate of the Mottahedehs' spending for 2001) | 22,378 |
| Peymon Mottahedeh | Peymon Mottahedeh's one-half share of $44,757 (the IRS's estimate of the Mottahedehs' spending for 2001) | 22,378 |
| Total | | 56,225 |

Therefore, it appears that (1) $44,757 was the IRS's determination of the Mottahedehs' nonwage income and (2) $56,225 was IRS's determination of the Mottahedehs' wage and nonwage income.  The Mottahedehs might have argued that the question to be resolved should be instead:  Did the Mottahedehs earn $56,225 of income?  Our answer to that question would be--yes.  In our view the preponderance of the evidence supports the proposition that the Mottahedehs' aggregate income for the year is at least $56,225.  Our view is informed by the

(continued...)

[*17] other years, 2002 through 2006, we must resolve similar questions with different income thresholds:  $61,536 for 2002, $69,653 for 2003, $66,924 for 2004, $56,850 for 2005, and $83,629 for 2006.  We find that the answers are yes for all of the years 2001 through 2006.  Our findings are supported by three types of evidence.  First, there is direct evidence that the Mottahedehs received payments of income in specific amounts.  For example, there are copies of checks and money orders from customers of the Freedom Law School that were deposited into April Mottahedeh's credit-union account.  And one of Peymon Mottahedeh's customers testified that he paid Peymon Mottahedeh $22,000 in cash for representing him before the California Franchise Tax Board.  Second, the record suggests that the specific amounts of income are but a fraction of the total income earned by the Mottahedehs.  The Mottahedehs tried to avoid banks and records.  Much of their income was therefore hidden from the IRS--and from the Court.

---

[14](...continued)
considerations outlined in the text, i.e., (1) direct evidence shows that the Mottahedehs received some payments of income, (2) these proven payments are but a small fraction of their actual income (because the Mottahedehs hid their income), and (3) the Mottahedehs must have paid their living expenses from some source.  In any event, the Mottahedehs do not argue that the correct figure for the Court to review is $56,225, not $44,757.  We are therefore not required to consider the effects of this methodological aspect of the notice of deficiency.

**[*18]** Third, the Mottahedehs had personal living expenses that must have been paid from some source.

The Mottahedehs counter that in reconstructing their income the revenue agent should have considered only the income reflected in their bank and credit-union records. But the Mottahedehs tried to avoid the use of banks. Their bank records would not provide sufficient information about their income. Furthermore, even the bank records that the revenue agent obtained were incomplete. The revenue agent was unable to obtain records of all of the deposits to the Mottahedehs' accounts. For these reasons, focusing exclusively on the income reflected in their bank records would underestimate the Mottahedehs' income. The revenue agent had to find other methods of estimating their income.[15] The revenue agent chose to use average spending statistics supplemented by estimates of actual spending amounts. The courts have permitted the IRS to rely on the use of average spending statistics when, as here, the taxpayer fails to

---

[15]The limited bank records led the revenue agent to reject the use of the bank-deposits method for reconstructing income. Under the bank-deposits method, a taxpayer's income for a year is generally calculated by: (1) determining the total amount of deposits into the taxpayer's bank account during the year, Calhoun v. United States, 591 F.2d 1243, 1245 (9th Cir. 1978); and (2) subtracting deposits that are not taxable, id., such as gifts received, loan proceeds, and transfers between accounts.

[*19] cooperate with the IRS.  In <u>Palmer v. United States</u>, 116 F.3d 1309, 1312

(9th Cir. 1997), the Court of Appeals for the Ninth Circuit stated:

> Courts have long held that the IRS may rationally use statistics
> to reconstruct income where taxpayers fail to offer accurate records.
> Reasonable methods include the use of cost-of-living statistics for a
> particular locale, <u>Wheeling v. Commissioner</u>, * * * [T.C. Memo.
> 1982-246], or average local income statistics for a particular
> profession." [All other citations omitted.]

In particular, the courts have permitted the use of spending statistics from the

Bureau of Labor Statistics.  <u>See</u> <u>Hanel v. Commissioner</u>, 6 Fed. Appx. 452, 453

(7th Cir. 2001) (permitting use of Bureau of Labor Statistics living-expense

statistics with modifications for expense categories for which IRS had

information); <u>Pollard v. Commissioner</u>, 786 F.2d 1063, 1066 (11th Cir. 1984)

(permitting use of regional living-expense statistics from Bureau of Labor

statistics), <u>aff'g</u> T.C. Memo. 1984-536, 48 T.C.M. (CCH) 1303, 1326 (1984);

<u>Giddio v. Commissioner</u>, 54 T.C. 1530, 1532-1533 (1970) (permitting use of

living-expense statistics from Bureau of Labor Statistics).  The Mottahedehs

contend that the spending statistics used by the revenue agent did not actually

come from the Bureau of Labor Statistics but from some other source.  The

Mottahedehs note that the revenue agent's estimates of their annual spending

[*20] increased 37% from 2001 to 2002.[16] They argue that statistics from the Bureau of Labor Statistics could not have shown that average household spending increased 37% in one year. Their argument rests on a misconception. The revenue agent did not rely exclusively on average household spending to estimate the Mottahedehs' spending. She also estimated their actual spending on the basis of information she had collected. The year-to-year changes in the estimates of the Mottahedehs' actual spending caused most of the increase in the revenue agent's spending estimates from 2001 to 2002. Furthermore, the revenue agent credibly testified that the Bureau of Labor Statistics was the source of the average-spending statistics that she relied on. Notations in her workpapers corroborate her testimony. We conclude that the revenue agent relied partly on average-spending statistics from the Bureau of Labor Statistics and partly on direct estimates of the Mottahedehs' spending, that this combined approach was a permissible method of estimating the Mottahedehs' spending under the circumstances, and that estimating the Mottahedehs' spending was a permissible method of reconstructing their income under the circumstances.[17]

---

[16]The revenue agent determined that the couple's spending was $44,757 in 2001 and $61,536 in 2002, an increase of 37%.

[17]In calculating self-employment tax, see sec. 1401(a) and (b) (imposing

(continued...)

**[\*21]** 2.    <u>Under California community-property law the income is community property, not Peymon Mottahedeh's sole property</u>.

After determining that the Mottahedehs earned $44,757 for 2001, $61,536 for 2002, $69,653 for 2003, $66,924 for 2004, $56,850 for 2005, and $83,629 for 2006, the IRS determined that half of each of these amounts was attributable to Peymon Mottahedeh and half was attributable to April Mottahedeh in computing

---

[17](...continued) self-employment tax on the self-employment income of every person); sec. 1402(b) (defining self-employment income as the net earnings from self-employment derived by a person); sec. 1402(a) (defining net earnings from self-employment as the gross income derived by a person from any business carried on by such person minus the deductions attributable to the business), the IRS determined that for each year Peymon Mottahedeh earned the amount of self-employment income that it determined was earned by the Mottahedehs in the aggregate for purposes of their income tax. For the reasons explained in this part, we sustain these determinations as to the aggregate amounts of self-employment income. As for the IRS's determination that for each year the aggregate amount of self-employment income was earned entirely by Peymon Mottahedeh, the Mottahedehs do not contest this determination. <u>See</u> sec. 1402(a)(5) (effective Mar. 2, 2004) (if income derived from a business jointly operated by a married couple is community property, the gross income and deductions attributable to the business are treated as the gross income and deductions of each spouse on the basis of their respective distributive share of the gross income and deductions); sec. 1402(a)(5) (effective before Mar. 2004) (if income derived from a business is community property, all of the gross income and deductions attributable to the business is treated as the gross income and deductions of the husband unless the wife exercised substantially all of the management and control of the business, in which case all of the gross income and deductions is treated as the gross income and deductions of the wife). Therefore, we need not reach the question of whether the aggregate self-employment income is attributable to Peymon Mottahedeh or April Mottahedeh.

[*22] the income tax imposed on each of the Mottahedehs.[18]  For federal-income-tax purposes, income that is community property under state law is generally treated as if half the income was earned by one spouse and half by the other. United States v. Mitchell, 403 U.S. 190, 196-197 (1971); sec. 1.66-1(a), Income Tax Regs. (effective July 10, 2003).  Under the laws of California, property acquired by a married person is generally community property.  Cal. Fam. Code sec. 760 (West 2004); see also id. sec. 770 (defining separate property of a married person);  Hanf v. Summers (In re Summers), 332 F.3d 1240, 1242-1243 (9th Cir. 2003) (noting the general presumption that property acquired during the marriage is marital property and identifying exceptions).  However, the married couple can by agreement have community property treated as separately owned property.  Cal. Fam. Code sec. 850 (West 2004); id. sec. 852(a).  The Mottahedehs have stipulated that they were married during all the years at issue.[19]  Therefore, all

---

[18]For 2001, the IRS divided the $44,757 between the Mottahedehs (under community-property principles) but attributed the $11,469 in wages earned by April Mottahedeh entirely to her.  The Mottahedehs contend that none of the income should be attributed to April Mottahedeh except the $11,469 in wages.

[19]The Mottahedehs stipulated:  "Petitioners were married during the years at issue."  The most sensible interpretation of this statement is that the Mottahedehs were married throughout the entire period January 1, 2001, through December 31, 2006.  Otherwise, one would suppose the parties would have stipulated that the Mottahedehs were married during only part of the years at issue.

(continued...)

[*23] property acquired by them during the years at issue is community property unless they have agreed otherwise. In October 2001, the Mottahedehs entered into an agreement that contained the following provision:

> That Mrs. April Love Mottahedeh hereby, voluntarily and without reservation, conveys to her husband as the personal and separate property of Mr. Peymon Mottahedeh and thereby divests from herself any right, interest or claim to, or in, the community property as set forth herein, effective from the date of this agreement and forward; and that all interest income, stocks, bonds, dividends, wages, income, rental income or other earnings, and realty and personal vehicles which Mr. Peymon Mottahedeh acquired by and through his own labor and/or initiative, or acquires in the future, is now and forever hereafter transmuted from the status of community property to the separate and distinct personal property of Mr. Peymon Mottahedeh, disposable by Mr. Peymon Mottahedeh, with respect to California Family Code Section 770, without the consent of and recourse to the adverse spouse.

---

[19](...continued)

The trial record suggests that the Mottahedehs were not married until the middle of the year 2001. The state court judgment that dissolved the marriage between April Mottahedeh and her previous husband was not filed until June 13, 2001. A community-property agreement between the Mottahedehs, signed in October 2001, states that the Mottahedehs had "executed vows of matrimony" on June 24, 2001. If the Mottahedehs were married for only part of 2001, as these documents suggest, the Mottahedehs might have argued that community-property principles, i.e., that a spouse owns one half of the other spouse's earnings, could not affect Peymon Mottahedeh's ownership of income he earned during the part of 2001 for which he was unmarried. Therefore, they might have argued, none of his income for this period could be attributed to April Mottahedeh under community-property principles. However, they did not make this argument. Furthermore, they stipulated that they were married during the years at issue. Under the circumstances, they have waived any such argument.

**[*24]** Under the quoted provision, April Mottahedeh disclaimed any community-property right to income earned by Peymon Mottahedeh through his "own labor and/or initiative." But the agreement contained no provision regarding ownership of income generated by the couple's joint efforts. And the record establishes that the couple's businesses were joint efforts of both spouses. See supra pp. 12-14. Accordingly, we hold that the income from the couple's businesses was community property and sustain the IRS's determination with regard to this issue.

3.      The Mottahedehs are liable for additions to tax.

The IRS has the burden of production with respect to additions to tax. Sec. 7491(c). The IRS satisfies this burden by producing sufficient evidence that it is appropriate to impose the relevant addition to tax. Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Once the IRS satisfies its burden of production, the taxpayer has the burden of persuading the Court that he or she is not liable for the addition to tax or penalty. Id. at 446-447. If the taxpayer wishes to raise an exception (or defense) to an addition to tax, the taxpayer bears the burden of producing evidence for the exception and persuading the Court that the exception applies. See id. at 446 (stating that the IRS "need not introduce evidence regarding reasonable cause, substantial authority, or similar provisions").

**[\*25]** a.     Section-6651(a)(1) failure-to-file additions to tax

The IRS determined that the Mottahedehs are liable for section 6651(a)(1) additions to tax for failing to timely file tax returns for the six tax years from 2001 through 2006.  Section 6651(a)(1) imposes an "addition to the tax" for failing to file a return by the filing deadline (taking account of any extensions), unless the failure is due to reasonable cause and not due to willful neglect.  The late-filing addition to tax is 5% of the net amount of tax due on the date prescribed for payment for each month the failure to file continues for up to five months.  Sec. 6651(a)(1), (b)(1).  Substitutes for returns made by the IRS under section 6020(b) are disregarded.  Sec. 6651(g)(1).

The Mottahedehs stipulated that they did not file returns for the tax years 2001 through 2006.  This satisfies the IRS's burden of producing evidence that the failure-to-file addition to tax should be imposed for each of the six tax years at issue.  See sec. 7491(c); Higbee v. Commissioner, 116 T.C. at 447.  The IRS's burden of producing evidence does not require it to prove that the taxpayer did not have reasonable cause for failing to file the return.  Higbee v. Commissioner, 116 T.C. at 446.  The Mottahedehs do not argue, nor does the record show, that they had reasonable cause for failing to file their tax returns.  We conclude that the Mottahedehs are liable for the section-6651(a)(1) failure-to-file additions to tax.

**[*26]** b.　　Section-6651(a)(2) failure-to-pay additions to tax

The IRS determined that the Mottahedehs are liable for section-6651(a)(2) additions to tax for failing to timely pay tax shown on a return for the tax years from 2001 through 2006.  Section 6651(a)(2) imposes an "addition to tax" for failure to timely pay the amount of tax shown on a return unless the failure is due to reasonable cause and not willful neglect.  The addition to tax under section 6651(a)(2) is imposed only if an amount of tax is shown on a return, Cabirac v. Commissioner, 120 T.C. 163, 170 (2003), and the IRS has the burden of production to show a return was filed.  A substitute for return is treated as a return "for purposes of determining the amount of the addition" under section 6651(a)(2).  Sec. 6651(g)(2).  The trial record shows that the IRS prepared substitutes for returns for the Mottahedehs in compliance with section 6020(b).  Cf. Wheeler v. Commissioner, 127 T.C. 200, 210 (2006), aff'd, 521 F.3d 1289 (10th Cir. 2008).  The Mottahedehs do not contend otherwise.[20]  The IRS has thus carried its burden of production under section 7491(c) to show that the Mottahedehs are liable for the addition to tax under section 6651(a)(2).  The Mottahedehs have not made any defense, and they are liable for the additions to tax.

---

[20]Nor do they dispute that they failed to pay the tax shown on the substitutes for returns.

**[*27]** c.     Section-6654 failure-to-pay-estimated-tax additions to tax

The IRS determined in its notices of deficiency that the Mottahedehs are liable for section-6654 additions to tax for failing to pay estimated income tax for the tax years 2001, 2002, 2003, 2004, 2005, and 2006, except that the IRS did not determine (nor does it now assert) a section-6654 addition to tax against April Mottahedeh for the tax years 2003 and 2004.  The IRS has since conceded that neither of the Mottahedehs is liable for the addition for 2001.

Under section 6654, an "addition to tax" is imposed on a taxpayer who does not make quarterly payments of estimated income tax.  Sec. 6654(a), (b)(1), (c).  Each quarterly payment is 25% of the "required annual payment."  Sec. 6654(d)(1).  To satisfy its burden of producing evidence that the Mottahedehs are liable for the section-6654 addition to tax, the IRS must at a minimum establish that they had a "required annual payment".  See sec. 6654(d)(1)(A); Wheeler v. Commissioner, 127 T.C. at 211-212.  The "required annual payment" for a taxable year is defined in section 6654(d)(1)(B) as--

the lesser of--

(i) 90 percent of the tax shown on the return for the taxable year (or, if no return is filed, 90 percent of the tax for such year), or

**[*28]**                    (ii) 100 percent of the tax shown on the return of the individual for the preceding taxable year.

Clause (ii) shall not apply if * * * the individual did not file a return for such preceding taxable year.

For each of the taxable years for which the IRS seeks to impose the section-6654 addition to tax (years 2002, 2003, 2004, 2005, and 2006), and for each of respective taxable years preceding these respective years, the Mottahedehs did not file a return and the IRS filed a substitute for return. Substitutes for returns have not been considered to be returns for the purpose of section 6654(d)(1)(B). See Duma v. Commissioner, T.C. Memo. 2009-304, 98 T.C.M. (CCH) 661, 665 n.6 (2009); Nino v. Commissioner, T.C. Memo. 2009-293, 98 T.C.M. (CCH) 621, 624 (2009). The Mottahedehs do not contend that the substitutes for returns should be considered returns. Therefore, clause (ii) does not apply and the required annual payment for each of the years for which the IRS seeks to impose the section-6654 addition to tax is 90% of tax for each of the years. The IRS has carried the burden of production under section 7491(c) with respect to the section-6654 additions to tax.

There are exceptions, set forth in section 6654(e), under which the taxpayer is relieved of the section-6654 addition to tax. The Mottahedehs do not contend, nor does the record show, that any of the exceptions applies. Therefore, Peymon

**[*29]** Mottahedeh is liable for the section-6654 additions to tax for 2002, 2003, 2004, 2005, and 2006, and April Mottahedeh is liable for the section-6654 additions to tax for 2002, 2005, and 2006.

4.      <u>We reject the Mottahedehs' other arguments</u>.

The Mottahedehs contend that the IRS audit was unconstitutional because it was motivated by their public criticism of the IRS.  The record does not demonstrate that the audit was motivated by criticism of the IRS.  Therefore, we reject this contention.

In reaching our holdings, we have considered all arguments made by the Mottahedehs and find them without merit.

At trial the IRS objected on relevancy grounds to the admission of Exhibits 45-P, 46-P, 47-P, 48-P, and 49-P.  The Court reserved its rulings.  The IRS has withdrawn its objections.  The Court will order the exhibits admitted.

To reflect the foregoing,

<u>An appropriate order and</u>

<u>decision will be entered</u>.